IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| B, N and G, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06 C 4912 |
| | ) | |
| MARK A. DUFF, KIM MILLER, JEFFERY | ) | Judge Virginia M. Kendall |
| BARGAR, THOMAS MATHIAS, | ) | |
| MARGARITA MENDOZA and LUKE | ) | |
| HARTIGAN, | ) | |
| | ) | |
| Defendants. | | |

## REDACTED  MEMORANDUM OPINION AND ORDER

Plaintiffs Minor B, Minor N and Minor T (collectively "Plaintiffs") filed suit against

Defendants Mark A. Duff ("Duff"), Kim Miller ("Miller"), Jeffery Bargar ("Bargar"), Thomas

Mathias ("Mathias"), Margarita Mendoza ("Mendoza") and Luke Hartigan ("Hartigan") pursuant

to 42 U.S.C. § 1983.  Specifically, Plaintiffs' Second Amended Complaint alleges that: 1) Minor B

and Minor T were repeatedly physically and sexually abused by Duff, a prison guard, while

incarcerated at the Illinois Youth Center in Warrenville, Illinois, and that Defendants Miller and

Bargar, the director of security and warden, respectively, were deliberately indifferent to and

consciously disregarded their heath, safety and welfare in violation of their right to be free from

cruel and unusual punishment under the Eight Amendment to the United States Constitution and

Section 1 & 2 of the Illinois Constitution (Counts I and III), and 2) Minor N was repeatedly

physically and sexually abused by Duff and Mathias, another prison guard, while incarcerated at the

Illinois Youth Center in Warrenville and that Miller, Bargar, Mendoza (an assistant warden), and

Hartigan (an assistant warden) were deliberately indifferent to and consciously disregarded her

health, safety and welfare and beat her when she refused to cooperate with them in violation of her

right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Section 1 & 2 of the Illinois Constitution (Count II). Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants Miller, Bargar, Mendoza and Hartigan (collectively, "Defendants") have moved for summary judgment. For the reasons stated, the Defendants' Motion for Summary Judgment is granted.[1]

## STATEMENT OF UNDISPUTED FACTS

Plaintiffs Minor B, Minor N and Minor T were all minor inmates at the Illinois Youth Center in Warrenville, Illinois ("Warrenville"). (Pl. 56.1 Resp. ¶¶ 1, 2, 3.)[2] Minor B and Minor T have since completed their sentences and have been released. (D.E. 121; Pl. 56.1 Resp. ¶ 39). Minor N was transferred to a different facility in May 2004 and transferred again in March 2007 to Dwight Correctional Center where she is currently serving the remainder of her sentence. (Pl. 56.1 ¶ 17; Ex.

---

[1] The docket for this case reflects that neither Duff nor Mathias have ever been served with a copy of a summons and complaint as required by Federal Rule of Civil Procedure 4. *See* Fed.R.Civ.P. 4(c). Plaintiffs have not filed a summons or waiver of service returned executed as to either individual or an affidavit by the process server, and unless service is waived, proof of service must be made to the Court. *See* Fed.R.Civ.P. 4(I). Likewise, neither Duff nor Mathias has made an appearance in this case either personally or through an attorney. Plaintiffs' initial Complaint naming Duff as a defendant was filed on September 11, 2006. On January 18, 2007, Plaintiffs' attorney represented to the Court that he had effectuated service on Duff back in October of 2006, and "was going to ask for default on him." 1.18.07 Tr. at 6. The Court then informed Plaintiffs' attorney that to obtain a default he must make a motion, and he must submit service of process and an accompanying affidavit to the Court. *See* 1.18.07 Tr. at 6. Plaintiffs attorney, however, never submitted a motion for default against Duff and never submitted proof of service for Duff. *See* Fed.R.Civ.P. 4(I). Plaintiffs subsequently filed a First Amended Complaint on April 25, 2007, adding Mathias as a defendant, and a Second Amended Complaint on June 26, 2007. On January 3, 2008, after being given several extensions of time for good cause, the Plaintiffs had still not effectuated service of process on Mathias, and the Court gave Plaintiffs one final extension of sixty days to effectuate service with the help of a special process server, *see* [D.E. 60]; however, the docket reflects that Plaintiffs never effectuated service on Mathias. *See* 1.03.08 Tr. at 13-19. Therefore, both Duff and Mathias are dismissed from Plaintiffs' Complaint for lack of service of process pursuant to Federal Rule of Civil Procedure 4(m). *See* Fed.R.Civ.P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed the court- -on motion or on its own after notice to the plaintiff- -must dismiss the action without prejudice against that defendant or order that service be made within a specified time."); *see also Mid-Continent Wood Product, Inc. v. Harris*, 936 F.2d 297, 301 (7th Cir. 1991) (district courts lack personal jurisdiction over defendants that have not been served and may properly dismiss them from the lawsuit pursuant to Fed.R.Civ.P. 4(m)).

[2] Citations to "Plaintiffs' Response to Defendants' Statement of Undisputed Facts" have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to "Defendants' Response to Plaintiffs' Rule 56.1 Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp. ¶ __."

B, ¶. 7-8).  She is expected to be released in April 2011.  *See* Illinois Department of Corrections,

http://www.idoc.state.il.us/subsections/search/inms_print.asp?idoc=R81116 (last visited July 01,

2009).[3]  During the time that Plaintiffs were incarcerated at Warrenville, Duff worked for the facility

as a Dietary Staff employee, Mathias was a Correctional Officer and Youth Supervisor, Bargar was

the Warden of the institution, Miller was the Chief of Security, Hartigan was the Assistant Warden

of Operations, and Mendoza was the Superintendent of Programs.[4]  (Pl. 56.1 Resp. ¶¶ 4, 5, 6, 7, 8,

9.)

    During his tenure at Warrenville, Warden Bargar adhered to a policy that allowed minor

female inmates to discuss issues with staff members who were expected to listen to the inmates and

try to help them work through their problems.  (Pl. 56.1 Resp. ¶ 54.)  If an inmate's problem

involved a mental health issue, the staff was required to make sure that a counselor or therapist was

called in to assist the inmate.  (Pl. 56.1 Resp. ¶ 54.)  Personal relationships between the staff and the

inmates were "discouraged" and the management communicated this clearly to the staff.  (Pl. 56.1

Resp. ¶¶ 54, 55; Def. Ex. D, p. 20; Def. Ex. G, ¶ 17-18.)

    While incarcerated at Warrenville, inmates were assigned to work in various areas of the

institution by an assignment committee.  (Def. 56.1 Resp. ¶ 6.)  Food supervisors in the kitchen,

however, were allowed to choose their staff.  (Def. 56.1 Resp. ¶ 6.)  Defendant Miller stated that this

policy resulted in the food supervisors "playing favorites" with preferred inmates.  (Def. 56.1 Resp.

---

[3]The Court can take judicial notice of a prisoner's release date from the Illinois Department of Corrections website because it is not subject to reasonable dispute.  *See* Fed. R. Evid. 201; *see also Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the FDIC).

[4]Mendoza began working at Warrenville on March 1, 2004.  (Pl. 56.1 Resp. ¶ 62.)

¶ 6; Def. Ex. G, p. 53.)

## Plaintiff Minor B

Minor B was brought to Warrenville sometime at the end of 2001 or the beginning of 2002, where she remained until she was transferred to IYC-Chicago in July of 2004. (Def. Ex. A, p. 8.) While incarcerated at Warrenville, Minor B worked on and off in the institution's kitchen under Duff's supervision. (Pl. 56.1 Resp. ¶ 5.) During that time, Minor B and Duff engaged in personal conversations outside the presence of other Warrenville staff. (Pl. 56.1 Resp. ¶¶ 6, 7.)[5] Minor B described her relationship with Duff as unprofessional and her conversations as not typical between an inmate and a correctional officer. (Def. 56.1 Resp. ¶ 2; Def. Ex. A, p. 9.) At some point during her incarceration, Defendant Miller spoke to Minor B about her relationship with Duff. (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 21.) Minor B, however, was hesitant to tell Miller what was taking place because she was scared; Miller was the chief of security and she was incarcerated at the institution. (Def. Ex. A, p. 11-12.) As a result, during her conversation with Miller, Minor B denied that Duff was having an improper relationship with her and did not request a change in work assignments. (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 21.) Minor B did not tell Miller that Duff had

---

[5] In its Response to Defendants' Statement of Undisputed Facts, Plaintiffs deny certain facts without any citation to the record, or instead of admitting or denying ceratin statements of fact, Plaintiffs respond, "Plaintiff has insufficient present knowledge to either admit or deny these allegations," again without any citation to the record. Under the Local Rules of this District, "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b). In order to controvert the statement of facts, the opposing party must include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to . . . the record." L.R. 56.1(b)(3)(B). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, this Court will not consider portions of Plaintiffs' submissions that do not conform to L.R. 56.1 and deems admitted all facts in Defendants' Rule 56.1 Statement of Facts not properly disputed by the Plaintiffs.

sexually assaulted her or that she feared that Duff was going to sexually assault her.  (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 21.)  Minor B testified that during her conversation with Miller, he told her that inappropriate conversations and unprofessional relationships with inmates "has been an ongoing thing with him," referring to Duff.  (Def. 56.1 Resp. ¶ 21; Ex. A, at 12.)

Eventually, in June or July of 2004, Duff had oral sex and sexual intercourse with Minor B on three separate occasions.  (Pl. 56.1 Resp. ¶ 9.)  All of these sexual acts occurred outside the presence of any of the Warrenville staff and were not captured on the institutions' security tapes.  (Pl. 56.1 Resp. ¶ 11.)  Minor B never informed the Warrenville staff that Duff was sexually assaulting her nor did she inform Bargar, Mendoza or Hartigan as to what was occurring.  (Pl. 56.1 Resp. ¶¶ 11, 12.)  Minor B never filed a grievance against Duff for his conduct.  (Pl. 56.1 Resp. ¶ 13.)  Minor B testified that she did not file a grievance against Duff because she was scared and did not want to face any physical reprisal from the staff at Warrenville.  (Def. 56.1 Resp. ¶ 36.)

On July 19, 2004, while still incarcerated at Warrenville, Minor B was interviewed by Illinois Department of Corrections' ("IDOC") investigators about her previous interactions with Duff.  (Pl. 56.1 Resp. ¶ 14.)  During this interview Minor B gave a signed written statement in which she stated that "she has never had sexual relations of any kind with Duff."  (Pl. 56.1 Resp. ¶ 14; Def. Ex. A, Minor B Dep. Ex. 1.)  On July 20, 2004, IDOC investigators conducted another interview with Minor B.  (Pl. 56.1 Resp. ¶¶ 14, 15; Def's Ex. A at p. 27-29).  During this interview, after the investigators told her that she would be taken out of Warrenville and shipped to another institution, Minor B gave a written statement stating that Duff had sexually assaulted her.  (Pl. 56.1 Resp. ¶¶ 14, 15; Def's Ex. A at p. 27-29).

**Plaintiff Minor N**

Minor N was an inmate at Warrenville from April until August 2002, and again from December 2002 until May 2004 when she was transferred to another institution. (Pl. 56.1 Resp. ¶ 17.) While incarcerated, Minor N primarily worked in the kitchen under Duff's supervision. (Pl. 56.1 Resp. ¶ 18.) During Minor N's first stay at Warrenville, Duff never initiated sexual contact with her; however, they had a very open relationship that went beyond a typical inmate staff relationship. (Pl. 56.1 Resp. ¶ 19; Def. 56.1 Resp. ¶ 2.) Minor N thought of Duff as her "best friend" and felt that he was someone she could "talk to similar to a counselor or a therapist." (Pl. 56.1 Resp. ¶ 19; Def. 56.1 Resp. ¶ 5; Def. Ex. G, ¶. 33-34.) In November 2003, during her second stay at Warrenville, Warden Bargar intercepted a letter that Minor N had written to Duff. (Def. 56.1 Resp. ¶ 7.) In the letter Minor N wrote,

> I miss working in the kitchen with you. When I do start back I will not get to work at night though that will really stink. [] I wish we could be more then [sic] friends but I know that can not happen while we are in here. I plan on meeting you in the parking lot when I get out. Ha! [] I know I should not think this way about you. You got a wife and kid at home. But I can not help it. I also can not hide it anymore. [] Well baby boy I am going to let your sexy ass go for now but never forever. Good night and sweet wet dreams.

(Def. 56.1 Resp. ¶ 7; Def. Ex. L.) Warden Bargar characterized Minor N's letter as nothing unusual and testified that nothing in it "would have set off any alarms in [his] mind about the relationship between Minor N and Duff." (Def. 56.1 Resp. ¶ 9; Def. Ex. D, p. 58-59.) Upon receiving the letter, Warden Bargar instructed Defendants Hartigan and Miller to interview Minor N about it. (Def. 56.1 Resp. ¶ 10.) Hartigan and Miller documented their interview with Minor N in an email dated November 11, 2003 and sent to Warden Bargar. (Def. 56.1 Resp. ¶ 10.) The email read:

> [Minor N] stated that Duff is still her friend and she enjoys the ability to talk freely to him about personal issues. She stated that she is aware he is married and has children. She denied any involvement

with Duff, however she stated that Duff would be someone she might take a risk with, referring to an improper relationship. She stated there are other staff with which she would also take that risk, but did not mention any names. She also admitted that she would be less than truthful if asked about such maters. She was later brought to your office where she reiterated that she is not involved in an improper relationship with Duff, but that he is someone she can talk to similar to a Counselor or a Therapist.

(Def. 56.1 Resp. ¶¶ 10, 11.) Warden Bargar testified that Minor N's statements that she might "take a risk" with Duff or other staff members and that she would be "less than truthful" if asked about such matters did not raise a "red flag" with him because he knew Minor N to be a "very unstable girl" that would "become fixated on an issue or on someone and just really try to embellish things." (Def. 56.1 Resp. ¶ 11; Ex. D, ¶. 66-67.) Defendant Hartigan testified, that in hindsight, Minor N's statement to him that she discussed personal issues with Duff would have raised concerns with him. (Def. 56.1 Resp. ¶ 12.) Hartigan also testified that Minor N's comment that she would be "less than truthful" if asked about taking a risk with Duff or another correctional officer did not raise any concerns with him as to Minor N's safety at the time; but it indicated that Minor N was someone that may or may not be truthful when interviewed. (Def. 56.1 Resp. ¶ 12, 13; Ex. G, ¶. 30-31.)

During Minor N's second stay at Warrenville, Duff had sex with her on three separate occasions and she performed fellatio on him once. (Pl. 56.1 Resp. ¶ 20.) All of these sexual encounters took place in the back pantry of the kitchen where there were no cameras so they would not get caught. (Pl. 56.1 Resp. ¶ 21.) After intercepting the letter that Minor N wrote to Duff, Defendant Miller repeatedly questioned her about the nature of their relationship. (Pl. 56.1 Resp. ¶¶ 22, 23.) Despite this repeated questioning, Minor N did not tell Miller that Duff had sexually assaulted her. (Pl. 56.1 Resp. ¶¶ 22, 23.) Defendants Mendoza, Hartigan and Bargar also questioned Minor N about her interactions with Duff but she never told anyone at Warrenville about

his behavior. (Pl. 56.1 Resp. ¶¶ 23, 24.) Additionally, Minor N never filed a grievance against Duff for sexually assaulting her. (Pl. 56.1 Resp. ¶ 26.)

The first time Minor N told anyone about Duff's sexual contact with her was in July 2004, when she was being questioned by investigators regarding Duff's arrest for charges of sexual assault against Minor B. (Pl. 56.1 Resp. ¶ 27.) Duff subsequently pleaded guilty in DuPage County to two counts of criminal sexual assault for sexual misconduct against Minor B. (Pl. 56.1 Resp. 53.) Minor N testified that she never told Defendants about her relationship with Duff "because she didn't want him to go to jail or get in trouble." (Def. 56.1 Resp. ¶ 20.)

On November 27, 2003, Minor N filed a grievance against Miller for allegedly using excessive force against her. (Pl. 56.1 Resp. ¶ 28.) The incident that gave rise to this grievance began when Minor N sat down on the floor and refused to get up. (Pl. 56.1 Resp. ¶ 29.) Defendants maintain that youth counselor Sparekas was working security and when he told Minor N to get up off the floor Minor N stated "fuck-no" and kicked him in the legs. (Pl. 56.1 Resp. ¶ 29.) At this point, Sparekas and Miller held Minor N down, cuffed her and took her to D-Wing. (Pl. 56.1 Resp. ¶ 29.) Minor N concedes that she sat on the floor and refused to get up, but alleges that Miller picked her up and threw her to the ground because she would not tell him about Duff's sexual misconduct. (Def. 56.1 Resp. ¶ 34; Def. Ex. B, p. 12-14.) Minor B described Minor N's injuries by stating that Minor N looked like a "pumpkin head" with her eyes closed and her lips swollen. (Def. 56.1 Resp. ¶ 35.) After receiving Minor N's grievance against Miller, the grievance officer recommended that Minor N's grievance be denied based on lack of evidence and the Chief Administrative Officer agreed with this recommendation. (Pl. 56.1 Resp. ¶ 30.)

While Minor N was incarcerated at Warrenville, Defendant Mathias also had sex with her

on two separate occasions in January 2004. (Pl. 56.1 Resp. ¶ 31.) No staff members or inmates were present during any of these sexual encounters. (Pl. 56.1 ¶ 32.) On March 5, 2004, after Minor N believed that she might be pregnant, she prepared a detailed written statement for one of the Warrenville correctional officers describing Mathias' misconduct. (Def. 56.1 Resp. ¶ 27; Def. Ex. B, Minor N Dep. at p. 22.) Minor N testified that when she informed the staff at Warrenville that she might be pregnant with Mathias' baby, the "administrators," wanted her to say that she was pregnant with Duff's baby instead. (Def. 56.1 Resp. ¶ 20.) That same day, after receiving a copy of Minor N's written statement, Hartigan interviewed her. (Pl. 56.1 Resp. ¶ 33; Def. 56.1 Resp. ¶ 27.) At Hartigan's request, Mendoza was also present during this interview. (Pl. 56.1 Resp. ¶ 33; Def. 56.1 Resp. ¶ 28.) While Minor N remembers that Warden Bargar and Defendant Miller were present as well, Mendoza does not recall Bargar or Miller being present during the interview at any time. (Def. 56.1 Resp. ¶ 28.) During the interview, Hartigan asked Minor N various questions about her allegation that Mathias sexually assaulted her, including when it occurred, what time it occurred and where it occurred. (Pl. 56.1 Resp. ¶ 34.) In response to Hartigan's questions, Minor N gave vague answers and did not provide any specific details. (Pl. 56.1 Resp. ¶ 34.) Hartigan and Miller reviewed the relevant security tapes but could not find any evidence on them to corroborate Minor N's allegation. (Def. 56.1 Resp. ¶¶ 29, 30; Ex. E ¶. 83-84.) During the interview, when Hartigan told Minor N that he did not see anything on the security tapes she told him that she had fabricated the whole thing. (Pl. 56.1 Resp. ¶ 35; Def. 56.1 Resp. 29.)[6] Mendoza was present when Minor N

---

[6] In its 56.1 Statement of Additional Facts, Plaintiffs state that "The defendants told Minor N she was lying and that unless she recanted, she would go to solitary confinement; that the assaults could not have happened; that she was off her medications." *See* Pl. 56.1 Statement of Add'l Facts ¶ 31. In support of this fact, Plaintiffs cite to Def. Ex. B (Minor N's deposition transcript), p. 84, however, Def. Ex. B does not have a page 84. Because this fact is unsupported with a proper citation to the record, the Court will not consider it. *See* Local Rule 56.1(b)(3)(c); *see also Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). ("A district court does not

recanted her allegation against Mathias. (Pl. 56.1 Resp. ¶ 36.) After Minor N orally recanted, she signed a written statement saying that "[a]fter some thinking and talking to Mr. Hartigan, I have come to the decision that my mind made me believe that I had done the things with Mr. Mathias when I did not." (Pl. 56.1 Resp. ¶ 37; Def. 56.1 Resp. ¶ 32.)

## Plaintiff Minor T

Plaintiff Minor T was an inmate at Warrenville in 2002 and again in 2003 for six months and was then released. (Pl. 56.1 Resp. ¶ 39.) During her second stay at Warrenville, Minor T worked in the kitchen under Duff's supervision. (Pl. 56.1 Resp. ¶ 40; Def. 56.1 Resp. ¶ 2.) After working in the kitchen for about a month, Duff began to talk to Minor T about personal topics such as his sex life, his wife and his kids; however, Minor T never told the staff at Warrenville about these inappropriate conversations. (Pl. 56.1 Resp. ¶ 41, 42.) At some point, Duff began "physically touching" Minor T. (Pl. 56.1 Resp. ¶ 43.) Minor T did not notify any of the Warrenville staff that Duff was inappropriately touching her. (Pl. 56.1 Resp. ¶ 44.) One day while Minor T was working in the kitchen with Duff, he digitally penetrated her vagina while the two were in the chip room of the pantry. (Pl. 56.1 Resp. ¶ 45.) No one was present at the time of this incident. (Pl. 56.1 Resp. ¶ 46.) Minor T did not tell anyone what happened. (Pl. 56.1 Resp. ¶ 46.) Minor T never filed a grievance regarding this incident and never reported it to any of the staff at Warrenville. (Pl. 56.1 Resp. ¶¶ 46, 47.) On the day that Minor T was paroled from Warrenville, Defendant Miller approached her and questioned her about Duff. (Pl. 56.1 Resp. ¶ 48.) Specifically, Miller asked Minor T if Duff had "ever hurt her." (Pl. 56.1 Resp. ¶¶ 48, 49.) Minor T responded that he had not. (Pl. 56.1 Resp. ¶¶ 48, 49.) Miller asked Minor T if she was lying and she again said "no." (Def.

---

abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." ).

56.1 Resp. ¶ 22.)  Minor T testified that she never told Miller about Duff's inappropriate sexual contact because Duff threatened her with confinement if she told anyone.  (Pl. 56.1 Resp. ¶ 50.) Duff was the only member of the Warrenville staff that ever threatened Minor T with confinement or any other penalty for reporting a staff member for sexual misconduct. (Pl. 56.1 Resp. ¶¶ 50, 51.) Aside from her interaction with Duff, no other staff member at Warrenville had inappropriate sexual contact with Minor T.  (Pl. 56.1 Resp. ¶ 52.)

Warden Bargar testified that sex between inmates and correctional officers is a recognized problem among professionals in the corrections field.   (Def. 56.1 Resp. ¶ 3.)  Knowing this, each time Miller informed Warden Bargar that an inmate had made an allegation that Duff or another staff member was having sexual contact with an inmate Bargar instructed Miller to investigate the situation further to determine if there was any evidence to corroborate or substantiate the inmate's claim.  (Def. 56.1 Resp. ¶ 3; Pl. 56.1 Resp. ¶ 60.)  For example, in January 2004, Lakeisha Jackson ("Jackson"), an inmate at Warrenville, told Warden Bargar that she had seen another inmate, Jessica Jester ("Jester"), kissing Duff in the kitchen.  (Pl 56.1 Resp. ¶ 56; Def. 56.1 Resp. ¶ 25.)  When questioned about it, Jester admitted to Miller that Duff had kissed her.  (Def. 56.1 Resp. ¶ 23.) When Miller asked Jester to reduce her statement to writing so that it "didn't become a he said/she said routine," Jester refused  because she "didn't want to have it interfere with [her] getting out." (Def. 56.1 Resp. ¶ 24.)  (Def. 56.1 Resp. ¶ 24; Ex. E, p. 49.) Miller reviewed the video surveillance for the date on which Duff allegedly kissed Jester but it revealed no evidence to substantiate Jackson's allegations.  (Pl. 56.1 Resp. ¶ 56; Def. Ex. E, p. 50-51.)  After realizing that he had no supporting evidence to corroborate Jackson's allegations, Warden Bargar told Miller to see if he could get more information on the matter.  (Pl. 56.1 Resp. ¶ 57.)  In response, Miller drove to IYC-Chicago, where

Jester had been transferred prior to her release, to see if he could get her to talk to him, but Jester refused to cooperate. (Def. 56.1 Resp. Def. ¶ 24; Ex. E, p. 50-51.) Miller also questioned Duff about the alleged incident. (Def. Ex. E, p. 51.) Duff denied the allegation. (Def. Ex. E, p. 51.) Eventually, Warden Bargar determined that based on a lack of evidence, no outside investigation was warranted. (Pl. 56.1 Resp. ¶ 56.) On January 20, 2004, Bargar wrote an email to the Internal Investigations Office in Springfield, Illinois which stated,

> Youth made an allegation alleging she saw another youth and my Dietary staff embrace and kiss in the dietary hallway on 01/19/04. We reviewed the video surveillance system, there was nothing to substantiate the allegations and movement as cited by the youth. All three youths left dietary together and the dietary staff was not alone with any of the youth as alleged.
>
> Per your direction, I reviewed this with Mr. Beck. As there is no evidence to substantiate the youth's allegation, and after reviewing the video surveillance, it would appear the youth is lying about the whole incident. No external investigation is warranted at this time. I will have my facility Internal Affairs Officer interview the youth who made the allegation to further determine why she made the claim. Youth will be held accountable for giving false information.

(Def. 56.1 Resp. ¶ 26; Ex. 2 to Ex. D.) Warden Bargar then referred the matter to the facility's Internal Affairs Officer so that he could interview Jackson to determine why she had made the allegation. (Pl. 56.1 Resp. ¶ 56.)

During the course of his tenure at Warrenville, Warden Bargar was aware of rumors that Duff and Mathias and two other male guards were having a sexual relationship with Minor N. (Def. 56.1 Resp. ¶ 15.) Miller believed that Minor N's and three other inmates' allegations that the staff were having improper relationships with the inmates (including Jesters discussed above) had "credence." (Def. 56.1 Resp. ¶¶ 16, 18; Ex. D, p. 84.) When asked what specific allegations he was referring to, Miller stated that Minor N and two of the other inmates had "a crush" on Duff and that

he was uncomfortable with the number of sex stories involving Duff that were coming out of the dietary unit. Miller was also uncomfortable with allowing inmates who had "crushes" on Duff to work with him so closely. (Def. 56.1 Resp. ¶ 16; Ex. E, p. 53-54.) Although he looked into each of these claims, at Warden Bargar's direction, Miller could not corroborate any of them. (Def. 56.1 Resp. ¶¶ 16, 18; Ex. D, p. 84.) Miller advocated bringing in outside investigators to Warden Bargar and Hartigan to follow up on inmates' reports that the staff were having improper relationships with the inmates and eventually an outside investigator was brought in. (Def. 56.1 Resp. ¶ 17; Ex. E, ¶. 74-75.)

On September 11, 2006, Minor B filed her Complaint in this Court. *See* [D.E. 1]. On April 25, 2007, Minor B filed a First-Amended Complaint that added Minor N as a plaintiff. *See* [D.E. 34]. On June 27, 2007, Minor B and Minor N filed a Second-Amended Complaint that added Minor T as a plaintiff. *See* [D.E. 45].

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a

proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I. Administrative Remedies

As an initial matter, Defendants contend that Plaintiffs' claims must be dismissed because they failed to exhaust their administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).[7] As a general rule, plaintiffs pursing civil rights claims under 42 U.S.C. § 1983 do not need to exhaust administrative remedies prior to filing suit in federal court. *See Porter v. Nussle*, 534 U.S. 516, 523 (2002). In 1996, however, as part of the PLRA and in an attempt to reduce the quantity of prisoner suits, Congress made exhaustion a mandatory prerequisite for a prisoner's civil rights suit, brought pursuant § 1983 that relate to conditions of confinement. *See Porter*, 534 U.S. at 524; *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (internal quotations omitted). ("A centerpiece of the PLRA's effort to reduce the quantity . . . of prisoner suits' is an invigorated exhaustion provision, § 1997e(a)."). The exhaustion requirement of the PLRA attempts

---

[7] In presenting its argument, Defendants' assert that the Court is without jurisdiction to hear Plaintiffs' claims; however, the Court notes that while a suit filed by a prisoner before administrative remedies have been exhausted must be dismissed, failure to exhaust administrative remedies does not deprive a court of jurisdiction. *See Perez v. Wisc. Dep't of Corrections*, 182 F.3d 532, 535-36 (7th Cir. 1999) ("Filing suit before exhausting prison remedies [] is not the sort of defect that judges must notice even if the defendant is happy to contest the suit on the merits.").

to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks "to affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford*, 548 U.S. at 93 (internal quotations omitted). The PLRA's exhaustion requirement reads: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a).

Under the PLRA, the language is clear: prisoners may not commence a suit regarding prison conditions before exhausting all available remedies. *See* 42 U.S.C. 1997e(a); *Porter*, 534 U.S. at 532. In applying this requirement, courts are to hold prisoners strictly to a prison's administrative rules. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). The PLRA's exhaustion requirement applies even where a prisoner is challenging a discrete incident and wants a form of relief-money damages-that the administrative process in a particular state, Illinois in this case, does not provide. *See Porter*, 534 U.S. at 532 ("[T]he PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes . . . ."); *Booth v. Churner*, 532 U.S. 731, 741 (2001) ("Congress has mandated exhaustion . . . regardless of the relief offered through administrative procedures."). An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement. *See Booth*, 532 U.S. at 741; *Perez v. Wisc. Dep't of Corrections*, 182 F.3d 532, 537 (7th Cir. 1999) ("There is no futility exception to § 1997e(a).").

The Illinois Department of Corrections has an established grievance process. *See* 20 Ill.Admin.Code §§ 504.800 *et seq.* An inmate can submit a written grievance to a designated

grievance officer who submits his recommendation to the institution warden.  *See* 20 Ill. Admin.

Code §§ 504.810, 504.830.  The grievance "shall be filed within 60 days after the discovery of the

incident, occurrence, or problem that gives rise to the grievance."  20 Ill. Admin. Code § 504.810(a).

After receiving the grievance officer's recommendation, the warden "shall advise the offender of

the decision in writing within 2 months after receipt of the written grievance, where reasonably

feasible."  20 Ill. Admin. Code § 504.830(d).  Alternatively, an inmate can request that a grievance

be handled on an emergency basis by submitting the grievance directly to the warden.  *See* Ill.

Admin. Code § 504.840.  If the warden determines that there is a substantial risk of imminent

personal injury or other serious or irreparable harm, the grievance is to be handled on an emergency

basis.  *See* Ill. Admin. Code § 504. 840.  The process also provides: "If, after receiving the response

of the [warden], the offender still feels that the problem, complaint, or grievance has not been

resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days

after the date of the decision."  20 Ill. Admin. Code § 504.850.

In their response to Defendants' Motion for Summary Judgment, Plaintiffs correctly point

out that Minor T was not a prisoner at the time this action was filed, and therefore her § 1983 claim

is not subject to the exhaustion requirements of § 1997e(a).[8]  *See* 42 U.S.C. § 1997e(a) ("No action

shall be brought with respect to prison conditions under section 1983 . . . , by *a prisoner confined*

*in any jail, prison, or other correctional facility* . . . .") (emphasis added).  Therefore, the Court will

only consider the Defendants' exhaustion argument with respect to Plaintiffs Minor B's[9] and Minor

---

[8]In their reply to their Motion for Summary Judgment, Defendants concede that Minor T was not a prisoner at the time this case was filed and that the exhaustion requirements of the PLRA do not apply to her.

[9] On May 28, 2009, counsel for Minor B submitted a Motion to Spread Release of Record in which he informed the Court that Minor B was released from prison on May 15, 2009.  In his motion, counsel insists, without any citation to the PLRA or case law, that Minor B's newfound status as a non-prisoner moots the Defendants'

N's § 1983 claims. Additionally, while Defendants assert that all of Minor B's and Minor N's claims must be dismissed for failure to exhaust, they fail to recognize that Minor B and Minor N have alleged violations of the Illinois constitution as well as § 1983 claims. The exhaustion requirements of the PLRA only apply to actions brought under 42 U.S.C. § 1983 or another Federal law, and therefore do not function as a precondition to suit for Minor B's and Minor N's claims against the Defendants under Illinois law. *See* 42 U.S.C. § 1997e(a).

Here, it is undisputed that neither Minor B nor Minor N ever filed a grievance against Duff for sexually assaulting them and Minor N never filed a grievance against Mathias for sexually assaulting her. It is also undisputed that while Minor N filed a grievance against Miller for allegedly using excessive force, the Chief Administrative Officer denied her grievance and Minor N never appealed the decision. Because Minor N failed to appeal the adverse decision, she did not exhaust her administrative remedies with respect to this grievance. *See Pozo*, 286 F.3d at 1025 (a prisoner's neglect to take a timely administrative appeal within the state system means that she has failed to exhaust state remedies for purposes of 42 U.S.C. 1997e(a)). Therefore, there are no material facts in dispute with respect to whether Minor B and Minor N exhausted their administrative remedies prior to filing suit for their § 1983 claims.

Minor B and Minor N do not dispute the statutory requirements of § 1997e(a), but assert that they are excused from exhausting under § 1997e(a) because there are no administrative remedies available for them to exhaust since they have been transferred to other institutions and are no longer inmates at Warrenville. Specifically, they claim that the sexual abuse they sustained is "past conduct

---

PLRA exhaustion argument with respect to Minor B. Counsel, however, is incorrect. *See Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004) (In determining whether a plaintiff is a prisoner subject to the PLRA's exhaustion requirements, the court "must look to the status of the plaintiff at the time he brings his suit.").

for which there is no present remedy available except money damages." (Pl. Resp. Br. at 6.) In support of their argument, Plaintiffs rely on dicta from the Seventh Circuit's 1999 decision in *Perez v. Wisc. Dep't of Corrections*, 182 F.3d 532 (7th Cir. 1999). In *Perez*, the court outlined a possible exception to § 1997e(a)'s exhaustion requirement where a prisoner's harm had been completed and no further administrative action could supply any remedy. 182 F.3d at 538. After *Perez* was decided, however, the Supreme Court decided *Porter v. Nussle*, 534 U.S. 516 (2001), which effectively closed the door on any exception to the exhaustion requirement left open in *Perez*. *Porter* held that § 1997e(a)'s exhaustion requirement is required for all prisoner suits seeking redress for prison conditions, whether they involve general circumstances or particular occurrences, and whether the inmate's complaint alleges Eighth Amendment violations based on excessive force or some other wrong. *Id*. at 532. In making its holding the Court stated that "[s]cant sense supports the single occurrence, prevailing circumstance dichotomy. Why should a prisoner have immediate access to court when a guard assaults him on one occasion, but not when beatings are widespread or routine?" *Id*. at 531. Since *Porter*, the Seventh Circuit has held that an inmate seeking to bring a § 1983 action against a prison guard after he was sexually assaulted by another inmate must exhaust his administrative remedies, even when he is challenging a discrete incident and seeks only money damages, which the administrative process does not provide. *See Riccardo v. Rausch*, 375 F.3d 521, 523 (7th Cir. 2004).

Here, even though Minor B and Minor N are challenging distinct incidents of sexual abuse that have come and gone, and they are only seeking money damages, they still must exhaust their administrative remedies. *See Woodford v. Ngo*, 548 U.S. at 84; *Porter*, 534 U.S. 532; *Booth*, 532 U.S. at 741; *Riccardo*, 375 F.3d at 523. Furthermore, it is irrelevant that Minor B and Minor N were

transferred to another institution and are no longer at Warrenville. First, both Minor B and Minor N had the opportunity to file a grievance while they were still incarcerated at Warrenville and for whatever reason they chose not to do so. Second, while movement out of an institution may render grievance procedures unavailable if the change in custody status effectively terminates the administrative process, that is not the case here. *See e.g., Westefer v. Snyder*, 422 F.3d 570, 578 (7th Cir. 2005). If Minor B and Minor N had not been transferred they could have filed grievances while incarcerated at Warrenville, and if they were unsatisfied with the result of those grievances they could have appealed to the Administrative Review Board ("ARB"). *See* Ill. Admin. Code §§ 504.810, 504.850. After Minor B and Minor N were transferred to different institutions, they were still able to file a grievance regarding the incidents that took place at Warrenville by submitting a grievance directly to the ARB. *See* Ill. Admin. Code § 504.870(a)(4). The transfer, therefore, had no effect on Minor B's and Minor N's ability to file a grievance or to exhaust their administrative remedies with respect to their allegations of sexual misconduct against Duff and Mathias.

Next, Minor B and Minor N contend that the Defendants' practice of suppressing inmate complaints about improper relationships between the staff and the inmates made the Plaintiffs' administrative remedies "unavailable." Inmates are not required to exhaust all administrative remedies, only those that are available. *See Woodford*, 548 U.S. at 102; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2007). The "availability" of a remedy is a matter of what, in reality, is open for a prisoner to pursue. *See Kaba*, 458 F.3d at 684. The appropriate analysis focuses on whether the plaintiff did all she could to avail herself of the administrative process. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). If she followed the prescribed steps and could do nothing more, then available remedies were exhausted. *Id*. at 811. "Prison officials may not take unfair advantage of

the exhaustion requirement, [ ] and a remedy becomes unavailable if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809. While the Seventh Circuit has not laid out a particular test for deciding when administrative remedies are unavailable, it has looked to the test laid out by the Second Circuit in *Hemphill v. New York*, 380 F.3d 680 (2nd Cir. 2004). The Second Circuit opted for an objective test, under which the court looks at whether "a similarly situated individual of ordinary firmness would have deemed the grievance procedures to be available." *Hemphill*, 380 F.3d at 688.

There are several ways in which an administrative process might not be available to a prisoner. For example, if grievances are to be filed on a particular form but the form is never provided to the prisoner, then there is no "available" remedy, despite its hypothetical possibility. *See Dale v. Lappin*, 376 F.3d 652, 656. Similarly, threatening a prisoner with violence for attempting to use an administrative process makes that process unavailable. *See Hemphill*, 380 F.3d at 688.

Here, there is nothing in the record to support Plaintiffs' contention that the Defendants engaged in a regular practice of suppressing inmates' complaints of sexual misconduct or that any action taken by the Defendants made Minor B's and Minor N's administrative remedies "unavailable." There is no evidence in the record that either Minor B or Minor N attempted to file a grievance or that the Defendants intimidated or threatened them into not pursuing one. Likewise, there are no facts in the record to support that either Minor B or Minor N were retaliated against for attempting to pursue administrative relief. The undisputed facts demonstrate that Minor B never mentioned anything to any of the Defendants about Duff's inappropriate behavior while she was

incarcerated at Warrenville. In fact, the record reveals that when Miller approached Minor B to inquire as to whether Duff was having a sexual relationship with her, Minor B denied that Duff had ever sexually assaulted her. Likewise, the undisputed facts demonstrate that Minor N was in love with Duff and that she did not want to file a grievance against him because she did not want to be responsible for him going to jail. Every time she was questioned by the Defendants, she specifically denied that Duff had ever had sexual contact with her. The record reveals that Minor N did not attempt to tell any of the Defendants that Duff was having a sexual relationship with her at any point during her stay at Warrenville, and in fact, the undisputed facts demonstrate that she actively hid it from the Defendants.

With respect to Minor N's allegations against Mathias, it is undisputed that Minor N filed a written statement in which she described her sexual encounters with Mathias and was subsequently interviewed by Hartigan and Mendoza. During this interview, after Hartigan informed her that there was no evidence on the security tapes to support her allegations, Minor N recanted her story and signed a written statement saying, "my mind made me believe that I had done these things with Mr. Mathias when I did not." Def. Ex. D, at Ex. 7. Although Minor N and Minor B assert that the Defendants suppressed their complaints against Duff and Mathias, making their administrative remedies unavailable, the record contains no factual support for their claim.

To support their position that their administrative remedies were unavailable because Defendants had a practice of suppressing inmates complaints of sexual misconduct, the Plaintiffs point to the fact that Miller slammed Minor N to the ground when Minor N would not tell him that Duff was sexually assaulting her. Although disputed by the Defendants, Plaintiffs assert that this fact somehow demonstrates that the Defendants suppressed Minor N's complaint about her improper

relationship with Duff; however, even if the Court were to take this fact as true, it does not support the Plaintiffs' contention.  If anything, it contradicts it.  If Miller did use physical violence against Minor N because she would not report Duff's sexual misconduct then this fact supports the inference that Miller was not suppressing, but encouraging, albeit in an inappropriate manner, Minor N to come forward with any information that she had about Duff.  Encouraging an inmate to come forward with information clearly does not demonstrate a practice of suppressing inmates' complaints, and therefore does not support the assertion that Plaintiffs' administrative remedies were unavailable.  Additionally, the undisputed fact that Minor N filed a grievance against Miller for allegedly slamming her to the floor when she would not tell him about her sexual relationship with Duff supports the inference that the Defendants were not using threats or other intimidation to deter Minor N from filing internal grievances.  The record reveals that Minor B and Minor N had the opportunity to file grievances, but simply chose not to.

Lastly, Plaintiffs attempt to make the argument that the PLRA's exhaustion requirements are unconstitutional as applied to Minor B and Minor N because it requires them to place their consent to sexual intercourse with an adult at issue.  Specifically, Plaintiffs claim that the PLRA classifies inmates and non-inmates, and as a result of this classification minor rape victim inmates, unlike non-inmates, are required to place their consent at issue.  Legislation that does not burden a suspect class or affect fundamental rights satisfies the equal protection requirement if the legislature could think the rule rationally related to any legitimate goal of government.  *See Johnson v. Daley*, 339 F.3d 582, 585 (7th Cir. 2003).  Prisoners are not a suspect class; conviction of a crime justifies the imposition of many burdens.  *See e.g., Connecticut Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003) (public identification as a felon); *Hudson v. United States*, 522 U.S. 93 (1997) (occupational

debarment). Accordingly, legislation singling out prisoners is analyzed under the rational basis standard. *See McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969); *see also Zehner v. Trigg*, 133 F.3d 459 (7th Cir. 1997) (applying the rational basis standard to 42 U.S.C. § 1997e(e), a part of the PLRA that requires prisoners to show physical injury as a condition to recovery, and holding that the statute is valid under that standard). Legislatures are "presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald*, 394 U.S. at 809. Under this standard, "rational basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (internal quotations and citations omitted).

There is no dispute that the PLRA classifies inmates and non-inmates; it requires inmates to exhaust administrative remedies prior to bringing an action under 42 U.S.C. § 1983. Plaintiffs, however, have set forth no evidence to show that there is no rational basis for § 1997e(a)'s exhaustion requirements. Plaintiffs' contention that the PLRA's exhaustion requirement violates the Equal Protection clause of the Fourteenth Amendment simply because it requires incarcerated minor rape victims to put their consent at issue in violation of Illinois statue and common law is insufficient. Plaintiffs must show that Congress could not possibly think that the exhaustion requirements of § 1997e(a) are rationally related to any legitimate goal of government to sustain an equal protection challenge, and the Supreme Court has thrice interpreted and enforced the PLRA's rule, 42 U.S.C. § 1997e(a), that prisoners (and only prisoners) must exhaust administrative remedies prior to bringing suit under § 1983. *See Woodford*, 548 U.S. at 81; *Porter*, 534 U.S. at 516; *Booth*,

532 U.S. at 731. None of these decisions hints that there is anything problematic about treating prisoners differently. Plaintiffs have set forth no evidence to demonstrate that there is no rational basis for the PLRA's exhaustion requirements as applied to Minor B and Minor N, and therefore their equal protection challenge fails.

Because there are no material facts in dispute with respect to whether Minor B and Minor N exhausted their administrative remedies prior to filing suit, the Defendants are entitled to judgment as a matter of law on Plaintiff Minor B's and Minor N's § 1983 claims (Counts I and II)[10] for failure to exhaust administrative remedies under 28 U.S.C. § 1997e(a). Further, neither Plaintiff has set forth any facts to demonstrate that a grievance was not timely filed for good cause. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("Dismissal for failure to exhaust is without prejudice . . . unless it is too late to exhaust."); *cf. Pozo*, 286 F.3d at 1022 (7th Cir. 2002) (if it is too late to pursue administrative remedies, then exhaustion will prove impossible and § 1997e(a) will permanently block litigation).

## II. Plaintiff Minor T's Section 1983 Claim (Count III)

Defendants next assert that they are entitled to summary judgment because the Plaintiffs have not put forth evidence that would permit a reasonable jury to conclude that they were deliberately indifferent to the Plaintiffs' health, safety and welfare in violation of their right to be free from cruel

---

[10]The Plaintiffs' Complaint is separated into three separate counts, each pertaining to a specific plaintiff; however, embedded within each count are two separate causes of action; a §1983 claim and an allegation that the Defendants violated the Illinois Constitution. The Court notes that proper procedure dictates that Plaintiffs' Complaint should have been separated into six separate counts instead of lumping two separate grounds for relief, a violation of the Illinois Constitution and a violation of the United States Constitution, into one single count. *See* Fed.R.Civ.P. 10; *see also Vigor v. Chesapeake & Ohio R. Co.*, 101 F.2d 865, 869 (7th Cir. 1939) (Fed.R.Civ.P. 10 requires a party to plead in separate paragraphs short, plain and direct statements of the contended grounds "whenever a separation facilitates the clear presentation of the matters set forth, as would be the case with different legal theories."). Nevertheless, as stated above, the failure to exhaust administrative remedies only applies to Minor B's and Minor N's § 1983 actions, and therefore do not dismiss Count I and Count II in their entirety.

and unusual punishment under the Eighth Amendment. Minor B's and Minor N's § 1983 claims have been dismissed for failure to exhaust administrative remedies, so the Court will focus exclusively on Minor T's § 1983 claim against Defendants Miller and Bargar. Minor T alleges that Miller and Bargar violated her Eighth Amendment right to be free from cruel and unusual punishment. Specifically, Minor T alleges that Duff sexually abused her while she was incarcerated at Warrenville and that Miller and Bargar failed to protect her and demonstrated deliberate indifference to her health and safety by "actively and passively participated in creating a prison culture where guards are free to use minor inmates as sex objects both by encouraging personal relationships and then ignoring and suppressing evidence of sexual abuse." (Pl. Resp. Br. at 2-3).

The treatment a prisoner receives in prison and the conditions under which she is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. Mckinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes a duty upon prison officials to "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 57, 526-27 (1984). Every injury suffered by a prisoner while incarcerated, however, does not translate into constitutional liability for the prison officials responsible for the victim's safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be objectively "sufficiently serious." *Id; see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities."). To satisfy this requirement, Minor T must show that she was incarcerated under conditions posing a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834. Here, Minor T claims that she was sexually assaulted by Duff while incarcerated at Warrenville and Defendants "do not dispute that the injuries that [Minor T is]

alleging are serious." (Def. Br. at 7).

The second requirement necessary to demonstrate that a prison official has violated the Cruel and Unusual Punishment Clause of the Eighth Amendment is that the prison official had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. In prison condition cases, the requisite state of mind is one of "deliberate indifference" to an inmates health or safety." *Id*. This inquiry is subjective; the prisoner must show that the individual prison official had subjective knowledge of the risk of harm, which he personally disregarded. *See Farmer*, 511 U.S. 834. Therefore, the inquiry is not whether Miller and Bargar *should have known* about risks to Minor T's safety, but rather whether they *did know* of such risks. *See id*. at 842-43. Requisite knowledge can be shown by direct or circumstantial evidence; a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *See id*. at 842; *see also Hall v. Bennett*, 379 F.3d 462 (7th Cir. 2004) ("A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendants sufficient to satisfy the subjective component of the deliberate indifference standard."). A risk is obvious where a prisoner can show the risk to be long-standing, pervasive, well-documented, or that it has been expressly noted by prison officials in the past. *See Farmer*, 511 U.S. at 842. Minor T need not show that Miller or Bargar acted or failed to act believing that harm would actually befall her or that the harm would be caused by the specific person who caused it; it is enough that they acted or failed to act despite their knowledge of a substantial risk of serious harm. *See id*. at 843-44 ("If . . . prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station, it would be obviously irrelevant to liability that the officials could not guess beforehand precisely who would

attack whom."). Yet, an official's failure to alleviate a significant risk that he should have perceived but did not is insufficient to establish deliberate indifference. *See Farmer*, 511 U.S. at 838.

The question is whether, drawing all reasonable inferences in Minor T's favor, a reasonable jury could conclude that Miller and Bargar knew about a substantial risk to Minor T's safety.[11] Here, the record reveals no direct evidence that Miller and Bargar were aware that Minor T faced a substantial risk of sexual assault. It is undisputed that Minor T never directly communicated to Miller or Bargar, or any of the staff at Warrenville, that Duff sexually abused her at any time during her stay. It is also undisputed that Duff's inappropriate contact with Minor T never occurred in front of the Center's cameras, that no other staff members or inmates were present during these sexual encounters, and that Minor T never filed a prison grievance against Duff. Likewise, Minor T never told Miller or Bargar or any of the staff at Warrenville that she was having inappropriate conversations with Duff, that he was talking to her about personal matters, or that she was uncomfortable with his behavior. Moreover, there is no evidence in the record that Minor T ever communicated to Miller or Bargar that she feared that Duff was going to hurt her or sexually abuse her, nor is there anything in the record to suggest that she ever requested a transfer from the dietary

_____

[11]It is unclear from Minor T's Complaint whether she is attempting to hold Miller and Bargar liable for their failure to protect her from Duff's alleged sexual assault or under a theory of supervisory liability, or both; however, Minor T sued Miller and Bargar in their individual capacities, and therefore the liability of each depends on a showing that they were "personally responsible for [Minor T's] constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002). (The doctrine of *respondeat superior* does not apply to § 1983 actions; personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983). Personal responsibility under a theory of supervisory liability can be established if Minor T can show that Miller and Bargar each knew about Duff's sexual misconduct and approved of it and the basis for it. *See Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). Therefore, a reasonable jury cannot find that Miller and Bargar violated Minor T's Eighth Amendment right to be free from cruel and unusual punishment under a theory of supervisory liability or individual liability if the facts in the record do not support the inference that Miller and Bargar had *knowledge* that she faced a substantial risk of sexual assault. *See Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) ("Supervisory liability will be found . . . if the supervisor, *with knowledge*, of the subordinate's conduct, approves of the conduct and the basis for it.") (emphasis added) (internal quotations and citations omitted).

unit where she worked with Duff. It is also undisputed that Minor T's failure to speak up about Duff's conduct was not through any fault of Miller or Bargar. Rather, the undisputed facts show that Minor T did not tell Miller or Bargar or any of the staff at Warrenville what was occurring because Duff threatened to put her in confinement if she did. At her deposition, Minor T conceded that Duff was the only Warrenville staff member that ever threatened her with confinement or any other penalty for reporting a staff member for sexual misconduct, and she specifically testified that Miller never threatened her in an attempt to suppress her complaints.

Minor T was in the best position to inform Miller and Bargar that she was at risk of a sexual assault by Duff, that she feared that she was at risk, or that she was simply uncomfortable around him. But, instead of informing Miller, Bargar, or any staff members of the risk, the undisputed facts show that she denied any wrongdoing on Duff's behalf. While the Court is sensitive to the fact that Minor T may have failed to mention her concerns to Miller and Bargar because she feared that Duff would put her in confinement, the end result is that Miller and Bargar were not directly informed of the risk. The Court's inquiry, however, does not stop here because the failure to give advance notice of a risk is not dispositive of the knowledge requirement. *See Farmer*, 511 U.S. at 842 (While a prisoner can prove knowledge of impending harm by demonstrating that she alerted prison officials to an identifiable threat, a prisoner can also show such an obvious risk of harm that the defendants' knowledge of the risk can be inferred.).

Here, despite the fact that Miller and Bargar's knowledge of a substantial risk can be inferred, Minor T presents no evidence showing that such an inference is appropriate. Drawing all reasonable inferences in Minor T's favor, the record is devoid of facts to permit a reasonable jury to find that there was an obvious risk of sexual assaults by prison guards at Warrenville such that

Miller and Bargar must have known about it, because there is no evidence in the record that the risk of sexual assaults by staff at Warrenville had been a long-standing, pervasive or well-documented problem. *See Farmer*, 511 U.S. at 842-43 ("If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."). The mere fact that sex between inmates and staff is a recognized problem among professionals, in general, at penal institutions, coupled with Bargar's knowledge of unsubstantiated rumors concerning one inmate and Miller's and Bargar's knowledge of four unsubstantiated allegations of sexual misconduct (out of the entire prison population at Warrenville)[12], is insufficient to permit a trier of fact to infer knowledge of a substantial risk because it consists of vague information, and it does not demonstrate an ongoing pattern, or real, *actual* risk of sexual assault by the staff members at Warrenville. *See Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (holding that an inmate who "told jail officials only that he was afraid and that he wanted to be moved" failed to put those officials on notice of an *actionable* threat); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759-60 (7th Cir. 2005) (three incidents of improper use of chemical spray by prison guards do not amount to "a widespread practice" or pattern of violations

---

[12]The Court takes judicial notice of the fact that the average daily population of inmates at Warrenville is 78. *See* Illinois Dept. of Corrections, http://www.idoc.state.il.us/subsections/facilities/information.asp?instchoice=wrv (last visited May 8, 2009); *see also* Fed.R.Evid. 201(b), (c) (A court may take judicial notice of a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the FDIC).

demonstrating that the sheriff was aware of a substantial risk of death to inmate).

There are no disciplinary reports, investigative reports, grievance reports, internal affairs investigations, or other similar documents in the record to demonstrate that sexual contact between female prisoners and male correctional officers at Warrenville is a pervasive problem such that Miller and Bargar should have been aware. If, for example, Minor T had come forth with evidence that there was a documented history of sexual abuse by the staff at Warrenville, that it was a concrete ongoing problem of which Miller and Bargar were aware, then this information could create a question of fact as to Miller and Bargar's knowledge of a substantial risk because it could arguably demonstrate that the risk of sexual assault by a staff member at Warrenville was obvious. *Cf. Daskalea v. District of Columbia*, 227 F.3d 433, 441(D.C. Cir. 2000) (finding a reasonable jury could find that District was on notice as to the repeated sexual abuse of women prisoners by D.C. correctional officers where sexual abuse was open and notorious and where a federal court had previously issued an order requiring the D.C. Dept. of Corrections to take all action necessary to remedy and prevent sexual abuse of female inmates by its employees.)

Instead, the record contains no evidence that Miller or Bargar were aware of, or ever received, an allegation of sexual misconduct by a staff member that was substantiated. Minor T, Minor B and Minor N concede that they never reported their allegations of sexual misconduct against Duff, or fear of sexual assault from Duff, to anyone on the staff at Warrenville, and that Minor N subsequently recanted her allegations against Mathias after she was told that the security tapes did not confirm her story. Additionally, the letter that Miller and Bargar intercepted from Minor N to Duff telling him that she loved him and stating that she wished they could be more than friends *but that she knows that it cannot happen while she is in prison* undercuts Miller's and

Bargar's knowledge because it suggests that there was no inappropriate sexual contact occurring between Minor N and Duff. Furthermore, the undisputed facts show that on the three other occasions where Miller and Bargar were informed of an allegation of sexual misconduct, they investigated the situation, which included a review of the institution's security tapes, and determined that there was no evidence to corroborate or substantiate the inmates' claims.

The relevant question is not whether Duff's assault on Minor T could have been prevented had Miller or Bargar conducted their investigations differently or better. The question is whether there is evidence from which a reasonable jury could find that they were deliberately indifferent to Minor T's safety. Even if the facts permit a reasonable jury to find that Miller and Bargar should have done a better job with their investigations, as a matter of law, that finding is insufficient to support a finding of deliberate indifference, because proving deliberate indifference "requires more than a showing of negligent or even grossly negligent behavior . . . . [T]he corrections officer must have acted with the equivalent of criminal recklessness." *Grieveson*, 538 F.3d at 776.

There is also no evidence in the record that Miller and Bargar were covering up allegations of sexual misconduct or suppressing inmates complaints. *See infra* Part I. To the contrary, as just discussed, the undisputed facts show that every time they received an allegation of misconduct they took affirmative steps to investigate the situation. In fact, Minor T herself stated that Duff was the only member of the Warrenville staff who ever threatened her to keep quiet about her allegations and there is nothing in the record to suggest that Miller or Bargar knew about Duff's threats.

Likewise, there is no evidence in the record to suggest that Miller or Bargar ever witnessed any inappropriate or improper conversations and contact between the staff and the inmates or that any other staff member witnessed such conduct and reported it to them. Additionally, there are no

facts in the record to indicate that Duff ever told Miller, Bargar or any of the staff members about his sexual relations with the inmates, nor that he ever bragged about it to anyone who would have passed the information along to Miller or Bargar.  In fact, the record reflects that when Miller asked Duff about the incident with inmate Jester, he denied the allegation.  The record is similarly devoid of evidence that the male staff at Warrenville, including Duff, made vulgar comments openly to the inmates, that the women were fondled publicly, or that any acts of sexual abuse were discovered on tape or in person by any of the staff at Warrenville.

The facts as presented in the record, taken in the light most favorable to Minor T, do not permit a reasonable jury to find that Miller or Bargar was aware that Duff posed a specific risk of harm to Minor T or that sexual assaults by the male guards at Warrenville was so common and uncontrolled that a reasonable jury could infer that Miller and Bargar had knowledge of a substantial risk.  The evidence might be sufficient to allow a jury to find that the defendants should have recognized the risk, but it does not reasonably permit an inference that Miller or Bargar was *actually* aware of the risk.  *See Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.").  Because Minor T has failed to establish the requisite element of subjective awareness, the record fails to demonstrate that the alleged incident between Minor T and Duff occurred due to any deliberate indifference by Miller or Bargar and therefore summary judgment is granted for the Defendants on Minor T's § 1983 claim.

### III.  Plaintiffs' State Law Claims

Plaintiffs' Complaint also alleges that the Defendants violated their right to be free from cruel and unusual punishment under Article 1, Sections 1 & 2 of the Illinois Constitution.  A district

court has the discretion not to exercise supplemental jurisdiction over pendent state law claims when it dismisses the claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). This discretion should not be exercised, however, if it is clearly apparent how the state law claims are to be decided. *See Williams v. Rodriquez*, 509 F.3d 392, 404 (7th Cir. 2007) (citing *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1252 (7th Cir. 1994)) ("If the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court."). Defendants have moved this Court for summary judgment as to all counts of Plaintiffs' Complaint and assert that Plaintiffs' evidence raises no genuine issues of material fact as a general matter, and therefore the Court will address Plaintiffs' state law claims. *See Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009).

Here, Plaintiffs assert that the Defendants violated their right to be free from cruel and unusual punishment in violation of the Article 1, Sections 1 & 2 of the Illinois Constitution; however, Sections 1 & 2 of Article 1 of the Illinois Constitution do not provide an independent right to be free from cruel and unusual punishment and Plaintiffs have not provided the Court with any support that Sections 1 & 2 of Article 1 of the Illinois Constitution are appropriate vehicles to maintain a claim for cruel and unusual punishment in the context of prison conditions. *See* Ill. Const. art. 1, §§ 1 & 2. While Illinois courts have addressed cruel and unusual punishment in the context of disproportionate sentences under Article 1, Section 11 of the Illinois Constitution, prisoner complaints that prison conditions violate their right to be free from cruel and unusual punishment are brought in Illinois courts under either the Eighth Amendment to the United States Constitution or under a statutory scheme such as the Unified Code of Corrections (730 ILCS 5/3-1-1 *et seq.*). *See e.g.*, *Arnett v. Snyder*, 331 Ill.App.3d 518 (Ill. App. 2001). Therefore, the Court finds

that Plaintiffs cannot maintain a cause of action for cruel and unusual punishment based on prison conditions under Article 1, Sections 1 & 2 of the Illinois Constitution.

Furthermore, even if there was a separate right under the Article 1, Section 1 & 2 of the Illinois Constitution to be free from cruel and unusual punishment, particularly in the context of prison conditions, then the Court's reasoning with respect to Plaintiff Minor T's § 1983 claim would be dispositive of Plaintiffs' pendent state law claims. *See Ashley v. Snyder*, 316 Ill.App.3d 1252, 1258 (Ill.App. 2000) ("Illinois law creates no more *rights* for inmates than those which are constitutionally required.") (Emphasis in original). Therefore, because Defendants are entitled to judgment as a matter of law on Plaintiff Minor T's § 1983 claims, Defendants would be entitled to judgment as a matter of law with respect to Plaintiffs' state law claims as well.[13]

[13]The Court's analysis on Minor T's § 1983 claim would apply to all of the Plaintiffs' state law claims because it focused on the knowledge prong of the deliberate indifference requirement, finding that the undisputed facts show that neither Minor B, Minor N nor Minor T directly communicated an actual threat of sexual assault by Duff or a fear of sexual assault by Duff to the Defendants, that Minor N recanted her allegation against Mathias, and that the record does not demonstrate such an obvious risk of sexual assault by staff members at Warrenville that a reasonable jury could infer that the Defendants had knowledge of an actual risk.

# CONCLUSION

For the reasons stated Minor B's § 1983 claim and Minor N's § 1983 claim are dismissed for failure to exhaust administrative remedies. Additionally, Defendants' Motion for Summary Judgment is granted as to Minor T's § 1983 claim and all of the Plaintiffs' state law claims.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: July 17, 2009